UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTWAN GLOVER,

     Plaintiff,

v.                            Case No: 8:24-cv-2913-MSS-NHA

CITY OF LAKELAND, et al.,

     Defendants.

_____

**ORDER**

This matter is before the Court on Defendants' Motions to Dismiss Plaintiff's Complaint. (Dkts. 17, 21) Plaintiff filed responses in opposition to the motions. (Dkts. 22, 23) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS IN PART and DENIES IN PART** the motions to dismiss.

**I.    BACKGROUND**

The following factual allegations come from Plaintiff's Complaint. (Dkt. 1) The Court does not opine as to the truth of the statements in consideration of this motion. Instead, by law, the Court must accept the pleaded facts as true and construe them in the light most favorable to Plaintiff in ruling on these motions to dismiss. Defendants will have the ability to challenge Plaintiff's factual assertions and reassert the arguments raised below as to truth and veracity at the summary judgment stage, with the benefit of a fully developed factual record and more complete briefing.

Plaintiff Antwan Glover sues Defendants City of Lakeland, Chief Sam Taylor, Sergeant Dillon Eby, Detective Dillon Cornn, Officer Anton Jefferson, and Officer Jason McCain for excessive force, false arrest, supervisory liability, and municipal liability. (Dkt. 1) Plaintiff's Complaint alleges that on December 18, 2022, Defendants Jefferson, McCain, Cornn, and Eby (the "Arresting Officers") observed Plaintiff driving approximately 3 to 5 miles per hour as he pulled up to his destination and parked his car. There the officers initiated a traffic stop of Plaintiff's vehicle after witnessing Plaintiff not wearing his seat belt. (Id. at ¶¶ 2, 40–44) During this stop, the Arresting Officers saw that there were two passengers in Plaintiff's car and a "cannabis cigar" near Plaintiff's cupholder. (Id. at ¶¶ 45–46) Plaintiff then opened his door to speak with the Arresting Officers. The Arresting Officers smelled burning cannabis and saw additional cannabis cigarettes in the vehicle's center console ashtray. Plaintiff informed the Arresting Officers that he had a medical marijuana card. (Id. at ¶¶ 49–50) The officers did not request to see Plaintiff's marijuana card. (Id. at ¶ 52)

At the time, Plaintiff had a brown "satchel" around his chest. The Arresting Officers inquired if there was a firearm in the satchel, and Plaintiff responded that he did not have a firearm. (Id. at ¶¶ 53–54) Defendant McCain then ordered Plaintiff to exit the vehicle, and Plaintiff questioned why he needed to get out of the vehicle. Defendant McCain then said, "get out of the fucking car," and Plaintiff attempted to exit the vehicle. Plaintiff was unable to exit the vehicle because Defendant McCain pushed the car door against him. Plaintiff rolled his window halfway down. (Id. at ¶ 58) Defendant McCain, aided by Defendant Cornn, then reached through the window

2

in an attempt to remove the satchel from Plaintiff's body. (Id. at ¶¶ 55–60) Defendant McCain was holding onto Plaintiff's right arm and hand and then grabbed Plaintiff around his head and upper torso and pulled Plaintiff in front of him. Defendants Cornn, McCain, and Jefferson then struggled with Plaintiff, bringing him to the ground. An officer then put his knees onto Plaintiff's back. (Id. at ¶¶ 61–65) Defendant Sergeant Eby stood by with a flashlight and yelled at Plaintiff's family members and bystanders to step away from the scene. Plaintiff's family members yelled at the Arresting Officers, "Don't hit him. Do not hit him." (Id. at ¶ 66)

The Arresting Officers eventually rolled Plaintiff onto his back, where he stayed and held his hands with open palms near his head. (Id. at ¶¶ 69–70)[1] Defendant Cornn stood over Plaintiff with one leg on either side of him and punched Plaintiff twice in the face. Defendant Jefferson also stood over Plaintiff and aimed his Conducted Energy Weapon ("CEW") at Plaintiff's chest. Defendant Jefferson then deployed the CEW causing Plaintiff to flail his arms and legs. The Arresting Officers then piled on top of Plaintiff and continuously shoved him into the ground. Defendant Jefferson then deployed his CEW into Plaintiff's upper back. The Arresting Officers then secured Plaintiff's arms behind his back and arrested him. Through this interaction, the Arresting Officers collectively deployed CEWs at least three times. (Id. at ¶¶ 71–76)

---

[1] This photograph, which is embedded in the complaint, appears to be a screenshot taken from a video. The video has not been made available at this stage in the litigation so that the Court can consider the full circumstances of the encounter.

The Arresting Officers then transported Plaintiff to the Lakeland Police Department. Upon arrival, Plaintiff told Defendant Cornn that he did not wish to speak to him, and Cornn responded, "shut the fuck up before we beat your ass again." Defendant McCain then removed Plaintiff from the vehicle, slammed him on the hood of the vehicle, and pulled Plaintiff's handcuffed arms up toward his head. (Id. at ¶¶ 78–85)

The Arresting Officers never located any weapons on Plaintiff's person, in Plaintiff's car, or inside Plaintiff's satchel. Plaintiff was charged with three counts of battery on a law enforcement officer and one count of resisting arrest with violence. Plaintiff was not charged with a seatbelt violation or possession of marijuana. (Id. at ¶¶ 86–88)

Defendant Chief Taylor placed the Arresting Officers on paid administrative leave in January 2023 pending investigation but ultimately found their use of force to be reasonable. Plaintiff's criminal charges were later dismissed. (Id. at ¶¶ 89–92) As a result of the aforementioned events, Plaintiff experienced both severe emotional distress and physical injury. (Id. at ¶¶ 93–97) As a result, Plaintiff initiated this action. Plaintiff's Complaint brings four claims pursuant to 42 U.S.C. § 1983: excessive force, false arrest, supervisory liability, and municipal liability. (Id.) Defendants now move to dismiss Counts I, III, and IV. For the reasons that follow, the Court finds that Defendants' Motions are due to be **GRANTED IN PART** and **DENIED IN PART**.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to

4

dismiss a complaint that fails "to state a claim upon which relief can be granted." To survive a motion to dismiss, a complaint must contain sufficient facts, accepted as true, to assert a facially plausible claim for relief. Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (per curiam). A claim is facially plausible when it raises "'a reasonable expectation that discovery will reveal evidence' of the defendant's liability." Miyahira v. Vitacost.com, Inc., 715 F.3d 1257, 1265 (11th Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997).

## III.    DISCUSSION

### A. Individual and Official Capacity

As a preliminary matter, Plaintiff's Complaint alleges that Plaintiff "seeks redress from all police officers named herein in both their official and individual capacities." (Dkt. 1 at ¶ 11) Defendants argue that to the extent Plaintiff seeks to sue the individual officers in their official capacity, such claims should be dismissed as redundant. Plaintiff does not address this argument in his responses.

In contrast to individual capacity suits, when an officer is sued under Section 1983 in his or her official capacity, the suit is simply "'another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978)). Such suits against municipal officers are therefore, in actuality, suits directly

against the city that the officer represents. See id. at 165–66; Brandon v. Holt, 469 U.S. 464, 471–72 (1985); Monell, 436 U.S. at 691; Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir. 1990). Here, Plaintiff has already asserted a Monell claim against the City of Lakeland. (Dkt. 1 at ¶¶ 137–71) Accordingly, any claims against the officers in their official capacity are redundant. Counts I – III shall proceed against the Arresting Officers and the Supervisory Officers solely in their individual capacity.

### B. Count I: Excessive Force

Defendants argue that Plaintiff's excessive force claim should be dismissed because the Arresting Officers are entitled to qualified immunity. Plaintiff responds that Defendants violated his clearly established Fourth Amendment right to be free from unreasonable search and seizure and as a result, Defendants are not entitled to qualified immunity. The Court finds that the Arresting Officers are not entitled to qualified immunity on Plaintiff's excessive force claim.

"Qualified immunity is a defense not only from liability, but also from suit, so courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013). When successfully invoked, qualified immunity shields from civil liability government officials who perform discretionary functions. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within his discretionary authority. Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1136 (11th Cir. 2007). If an official was acting within his discretionary authority,

6

then the burden shifts to the plaintiff to establish that the official is not entitled to immunity. Id.

Once the burden shifts, the plaintiff must show that (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the alleged violation. Id. To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Qualified immunity will shield the defendant official from civil liability if a plaintiff fails either prong of the analysis. Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) (citing Pearson v. Callahan, 555 U.S. 223, 242 (2009)). Neither Plaintiff nor Defendants addresses whether Defendants were acting within their discretionary authority at the time of the incident, though it appears that both parties assume he was. As such, the Court will assume that Defendants were acting within their discretionary authority as police officers and turn to the next step. See Jackson v. Humphrey, 776 F.3d 1232, 1240 (11th Cir. 2015) (bypassing the discretionary authority inquiry where not disputed); see also Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019) ("Defendant Officers readily satisfied [the discretionary authority requirement], as they undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions.").

    1. Violation of a Constitutional Right

First, the Court looks to whether Plaintiff has adequately alleged that Defendants violated his constitutional rights. Excessive force claims arise from the

7

Fourth Amendment's prohibition against unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989). To state a claim for excessive force, a plaintiff must allege that "(1) a seizure occurred and (2) that the force used to effect the seizure was unreasonable." Troupe v. Sarasota Cnty., 419 F.3d 1160, 1166 (11th Cir. 2005). Here, it is undisputed that a seizure occurred, and that force was used to accomplish that seizure. Thus, the issue is whether Plaintiff has adequately alleged that the force used during his arrest was unreasonable. Defendants argue that the Arresting Officers' use of force was de minimis or otherwise reasonable. Plaintiff disputes this assertion.

In evaluating whether the force was excessive, the Court must examine: "(1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted." Edwards v. Grubbs, No. 24-12787, -- F.4th --, 2026 WL 706637, at *5 (11th Cir. Mar. 13, 2026) (quoting Wade v. Daniels, 36 F.4th 1318 (11th Cir. 2022)); see also Graham, 490 U.S. at 396. In this respect, the Supreme Court has "recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.

First the Court considers the severity of the plaintiff's alleged crime. Plaintiff's Complaint alleges that the Arresting Officers initiated a traffic stop after witnessing Plaintiff not wearing a seatbelt. (Dkt. 1 at ¶ 40) The Arresting Officers then reportedly saw and smelled marijuana, at which point Plaintiff informed the Arresting Officers

that he had a medical marijuana card. (Id. at ¶¶ 46, 49, 50) Thus, the crimes of which Plaintiff was suspected qualify as a traffic offense and a potential misdemeanor (depending on the veracity of Plaintiff's representation). This factor weighs in Plaintiff's favor.[2]

Next, the Court considers whether Plaintiff posed an immediate threat to others. Accepting Plaintiff's factual allegations as true, as the Court must at this stage of the litigation, there is no indication that Plaintiff posed any sort of threat to anyone. Defendants argue this factor weighs in their favor because Plaintiff was wearing a satchel around his body and he initiated a struggle with the Arresting Officers while wearing the satchel. Thus, Defendants conclude that the Arresting Officers had no way of knowing whether Plaintiff was armed during this interaction. This argument fails.

First, there is no indication *in Plaintiff's Complaint* that he "initiated" a struggle with the Arresting Officers. With that consideration, Defendants essentially allege that Plaintiff posed a threat of harm to others because he was wearing a satchel. The Court cannot accept the contention that a man in a car at night wearing a satchel can automatically be perceived as a threat under an objective reasonableness standard.

Defendants, relying on Fils v. City of Aventura, 647 F.3d 1272 (11th Cir. 2011), also assert that there was an increased risk of danger because the incident occurred at

---

[2] Even assuming Plaintiff did not have a medical marijuana card, this factor would weigh in his favor as mere possession of marijuana in Florida is a misdemeanor. Fla. Stat. § 893.13(6)(b); see Smith v. City of Montgomery, No. 2:10-cv-1007-WKW, 2011 WL 5216309, at *11 (M.D. Ala. Nov. 2, 2011) ("Because this is a misdemeanor, less force is generally appropriate.").

night and in front of Plaintiff's displeased and possibly under the influence passengers and/or relatives. First, these facts are not pleaded in the Complaint. If true, they may be developed in discovery and could possibly serve as a basis for a motion for summary judgment. Second, the facts of this case are not sufficiently similar to Fils on this point. In Fils, a series of arrests took place outside of a nightclub at 3:00 a.m. During this course of events, two officers tased one of the patrons.[3] After the patron was tased, the crowd became more unruly, with someone "yelling and attempting to incite a crowd by yelling 'fuck that, you cops ain't right.'" Id. at 1278. The Eleventh Circuit found the officer did not use excessive force against Fils when fifteen to twenty possibly intoxicated people outside of the club were screaming because of the preceding arrests, Fils herself was screaming at the officers, and one officer saw Fils take a step toward another officer and concluded that unsuspecting officer could not defend himself in that moment. Id. at 1290.

Here, Plaintiff was in a residential area on a Sunday night around 6:00 p.m. (Dkt. 1 at ¶¶ 32, 38) Plaintiff was parked in a car and did not advance toward any Officer. (Id. at ¶¶ 41, 56–60) Unlike in Fils where it was reasonable to infer that a boisterous crowd outside of a nightclub at 3:00 a.m. may be intoxicated, here there is no support for the assumption that Plaintiff's family members and other bystanders may have been under the influence. The presence of marijuana in Plaintiff's car is in no way correlated to the people who were not in Plaintiff's car. Notably, the bystanders

---

[3] Notably, the Eleventh Circuit found this tasing to qualify as excessive force. 647 F.3d at 1290. See infra, pp. 19–20.

in <u>Fils</u> were attempting to incite the crowd, whereas here the bystanders were yelling "[d]on't hit him," and "[s]top punching my dad." (Dkt. 1 at ¶¶ 66, 68) In all, the Court declines to find that the family members and bystanders outside pleading with the Arresting Officers while they were allegedly assaulting Plaintiff materially added to the dangerousness in the situation. <u>See also</u> <u>Stephens v. DeGiovanni</u>, 852 F.3d 1298, 1328 (11th Cir. 2017) (noting no increased threat where the plaintiff's girlfriend's children were watching the arrest from the balcony). This factor weighs in Plaintiff's favor.

The Court next considers whether Plaintiff was resisting arrest. Defendants argue that, once Plaintiff was out of the vehicle, he was resisting arrest. In support, Defendants rely on the following allegation in Plaintiff's Complaint: "Defendant Cornn, Defendant McCain, and Defendant Jefferson struggle with Plaintiff, bringing him to the ground." (Dkt. 1 at ¶ 63) That the Arresting Officers struggled to bring Plaintiff to the ground after forcefully removing him from his vehicle without warning does not necessarily indicate that Plaintiff was resisting arrest. This is particularly true at this stage of the proceedings where the Court is required to accept all allegations as true and construe them in the light most favorable to Plaintiff.

The Complaint contains no other allegations that would suggest Plaintiff resisted arrest. To the contrary, Plaintiff alleges that he attempted to comply and to exit the car as directed, but Defendant McCain pushed the car door into him and then reached in the open window to try to remove the brown satchel from his body. Plaintiff's Complaint further alleges that after the officers had secured Plaintiff on the

11

ground one of them placed a knee to his back and others punched him in his face at least three times. They then rolled him on his back, he raised his hands above his head, palm up in a posture of complete surrender. Defendant Cornn then stood over Plaintiff, straddling him and punched him twice more in the face, whereupon Defendant Jefferson deployed his taser into Plaintiff's torso and the officers then all piled on top of him and Defendant Jefferson deployed his taser again, this time into Plaintiff's back. (Id. at ¶¶ 57–74) Viewing this claimed conduct in the light most favorable to Plaintiff, the Court finds that this factor weighs in Plaintiff's favor as well.

The Court next considers the need for the use of force. There is no allegation in the Complaint to support any indication that the Arresting Officers needed to use force. The Complaint alleges that, while Plaintiff attempted to comply with the request to exit his vehicle, Defendant McCain pushed the car door against him and began forcefully pulling him out of the car to bring him to the ground. Thus, Plaintiff was not given an opportunity to comply with the officers' demands. This factor weighs in Plaintiff's favor.

Considering the nature of the alleged law violation, a seatbelt violation and a possible marijuana violation, the Court further discounts the claimed need to deploy force to resolve the encounter. Of course, where, as alleged, there does not appear to be any need for force, the amount used was excessive. This factor also weighs in Plaintiff's favor. See also Ingram v. Kubik, 30 F.4th 1241, 1252 (11th Cir. 2022) (use of force was not reasonably proportionate to the need for force where the plaintiff "was

12

not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time").

Finally, the Court looks to the injuries inflicted. Plaintiff alleges that as a result of the excessive force inflicted by the Defendants, he underwent surgery to repair his damaged shoulder and was referred for physical therapy. He also required a procedure to repair a tooth that the Officers injured in the exercise of their excessive force. He also alleges that he suffers exacerbated symptoms of PTSD, anxiety, and depression and was referred to mental health professionals for therapy. (Dkt. 1 at ¶¶ 94–96) These are not de minimis injuries. This factor weighs in Plaintiff's favor.

Nonetheless, Defendants argue that any force against Plaintiff was de minimis. They contend that "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003). For this reason, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000). That is, "a minimal amount of force and injury. . . will not defeat an officer's qualified immunity in an excessive force case." Id. at 1258.

Indeed, Defendants correctly point out that courts have found certain uses of force described by Plaintiff to qualify as de minimis force. See, e.g., Nolin, 207 F.3d at 1257, 1258 n.4 (force was de minimis where officer shoved the plaintiff against a vehicle and pushed his knee against the plaintiff's back); Taylor v. Taylor, 649 F. App'x 737, 746 (11th Cir. 2016) (finding use of force de minimis where, "during the

13

course of a permissible arrest, [the officer] grabbed [the plaintiff] without warning, slammed her against a patrol car several feet away, causing her head to hit the car first, and then handcuffed her" with the result that plaintiff "suffered a spiral fracture in her hand and bruising to her hand, forearm, right upper eyelid, and chest"); Woodruff v. City of Trussville, 434 F. App'x 852, 855 (11th Cir. 2011) (punching plaintiff in the face, forcefully removing him from his car, and slamming him on the ground constituted de minimis force). First, the Court notes that Taylor and Woodruff are unpublished opinions. In the Eleventh Circuit, "unpublished decisions, with or without opinion, are not precedential and they bind no one." Stephens, 852 F.3d at 1327 n.31 (citing 11th Cir. R. 36-2). Moreover, in Nolin, the plaintiff was arrested in the midst of a physical altercation and suffered only minor bruises that disappeared quickly. 207 F.3d at 1254–55. The officer used force to effectuate the arrest, but no force after securing the plaintiff. Id.

More importantly, however, the Eleventh Circuit has never used the de minimis force principle to "immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat." Saunders v. Duke, 766 F.3d 1262, 1269–70 (11th Cir. 2014); see also Stephens, 852 F.3d at 1327 (rejecting argument that force was de minimis given the severe injuries the plaintiff suffered); Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (punching the plaintiff in the stomach while handcuffed and not resisting constituted excessive force). As set forth above, Plaintiff's Complaint alleges that he was not resisting arrest. Even if some de minimis force was required to remove Plaintiff from the vehicle to effectuate an

14

arrest, once Plaintiff demonstrated his compliance, the subsequent uses of gratuitous force would be considered excessive. See, e.g., Hadley, 526 F.3d at 1330. Accordingly, the Court concludes that Plaintiff's Complaint adequately pleads a constitutional violation.

### 2. Clearly Established Right

Having found that Plaintiff's Complaint adequately alleges a constitutional violation, the Court must determine whether that right was "clearly established" on the date of the incident. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Edwards, 2026 WL 706637, at *7 (quoting District of Columbia v. Wesby, 538 U.S. 48, 63 (2018)). The Supreme Court has repeatedly and very recently emphasized the necessity of defining clearly established rights with specificity. See, e.g., Zorn v. Linton, 607 U.S. --, 2026 WL 795469, at *2 (Mar. 23, 2026); Wesby, 538 U.S. at 63–64 ("We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.") (quotations omitted).

With Fourth Amendment excessive force claims, the Court has further underscored that precedent at the time of the challenged conduct must "'squarely govern[]' the specific facts at issue" to create clearly established law because "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case.'" Kisela v. Hughes, 584 U.S. 100, 104–05 (2018) (per

15

curiam) (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" Wesby, 538 U.S. at 64 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). The Eleventh Circuit has held that a plaintiff can show that a right is clearly established in one of three ways: "(1) case law with indistinguishable facts, (2) a broad statement of principle within the Constitution, statute, or case law, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Crocker v. Beatty, 995 F.3d 1232, 1240 (11th Cir. 2021).[4]

The Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." Patel v. City of Madison, Ala., 959 F.3d 1330, 1343 (11th Cir. 2020). The court has also explained that "the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing but in the course of

---

[4] The Supreme Court's recent decision in Zorn v. Linton could be read as merging the first and second methods into one, such that there is a hard requirement that a factually identical case be shown in order for a right to be said to be clearly established. 2026 WL 795469, at *6 (Sotomayor, J., dissenting) ("At bottom, the majority's analysis rests on the assumption that the law can be clearly established only by factually identical 'case[s] directly on point,' despite the Court's rejection of such a standard.") (citing White v. Pauly, 580 U.S. 73, 79 (2017)). The Eleventh Circuit has not had occasion to address the issue, and the Parties have not had a chance to brief the issue. This Court does not need to resolve this question at this juncture of the case, however, because it finds that the relevant controlling precedent here is sufficiently factually analogous such that every reasonable officer would understand the uses of force deployed over the course of the arrest of Plaintiff *as alleged in the complaint* were excessive.

16

the investigation." Stephens, 852 F.3d at 1328 & n.33. The question then becomes, was it "clearly established" that the uses of forces alleged here—namely, punching, tasing, and slamming plaintiff against a vehicle at various points during his arrest—qualified as "gratuitous" force? The Court finds that it was.[5]

As an initial matter, the Court notes that the Eleventh Circuit has held that officers are not entitled to use *any* force when the suspect neither resists arrest nor poses a danger to the officer. Hadley, 526 F.3d at 1330; see also Acosta v. Miami-Dade Cnty., 97 F.4th 1233, 1241 (11th Cir. 2024) (holding that it was "clearly established" in February 2014 that "a police officer is prohibited from using force against a *non-resisting suspect*") (emphasis in original). Even without relying solely on this "broad

---

[5] Relying on the "broad principle of law" and "obvious clarity" methods, the Eleventh Circuit has consistently held that it is clearly established that the gratuitous use of force against a non-resisting suspect qualifies as excessive force in violation of the Fourth Amendment. See, e.g., Richmond v. Badia, 47 F.4th 1172, 1184 (11th Cir. 2022) (officer who grabbed non-resisting suspect's face, slammed him to the ground, and twisted his arm was on notice that his conduct was unlawful under both "broad principle of law" and "egregious conduct" theories); Ingram, 30 F.4th at 1252–54 ("broader, clearly established principle" put officer on notice that he could not body slam non-resisting, compliant suspect without warning); Patel, 959 F.3d at 1343–44 (officer who swept non-resisting suspect's legs out from under him was on notice that his conduct was unlawful under the "broad principle" and "obvious clarity" tests); Stephens, 852 F.3d at 1328 (officer's use of gratuitous force on a suspect who was not resisting presented "obvious-clarity facts" that rendered "particularized preexisting case law" irrelevant); Fils, 647 F.3d at 1292 (under "obvious clarity" method, officers should have known that they violated suspect's Fourth Amendment rights when they "tased [the suspect] even though he committed at most a minor offense; he did not resist arrest; he did not threaten anyone; and he did not disobey any instructions (for none were given)"). In an abundance of caution and in deference to a possible interpretation of the Zorn opinion, see *supra* n.5, the Court relies on case law with substantially similar facts, specifically those involving the same types of force deployed against non-resisting suspects. To that end, regardless of whether a court may still apply the "obvious clarity" method after the Zorn decision, these cases now clearly establish instances of excessive force such that all reasonable arresting officers are duly placed on notice that such conduct will strip them of qualified immunity.

17

principle," however, the Court finds the constitutional violations alleged here to be clearly established.

First, the Eleventh Circuit has held that even a single punch of a non-resisting suspect qualifies as excessive force. Hadley, 526 F.3d at 1330. In Hadley, the plaintiff was under the influence of cocaine and was causing a disturbance at a grocery store. The plaintiff conceded that he resisted arrest while inside the store. After the plaintiff was secured in handcuffs and was being escorted to the police car, one officer punched the plaintiff in the stomach. Id. at 1327–28. The Court held that, under these facts, the plaintiff "neither resisted arrest nor posed a danger to [the officer] sufficient to warrant a blow to the stomach. Thus, [the officer] was not entitled to use any force at that time." Id. at 1330. The Court then held that every reasonable officer would "conclude that that the force used here—punching a non-resisting criminal suspect for no apparent reason other than malice—is not protected by our constitution." Id. at 1333–34. That Plaintiff was not handcuffed when he was punched is of no matter. Stephens, 852 F.3d at 1328 n.33 (explaining "the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing but in the course of the investigation").

Moreover, the Eleventh Circuit has consistently held in case-specific examples that the use of a taser against a compliant, non-resisting suspect qualifies as excessive force. See Helm v. Rainbow City, Ala., 989 F.3d 1265, 1276 (11th Cir. 2021); Fils, 647

F.3d at 1290; see also Acosta, 97 F.4th at 1239–40.[6] In Helm, a teenage girl suffered a seizure at a concert. She was brought to the lobby of the venue and her sister informed police officers (who were providing security for the event) that the girl was suffering a seizure. The officers held the girl on the ground while another officer called for paramedics. While the girl was being held down, an officer entered the lobby, saw an "out of control female," and warned the girl that if she did not calm down, he would tase her. He then tased her. After another warning, the officer tased her a second and third time while the girl was being held down by other officers. 989 F.3d at 1269–70. At some point, the girl's mother arrived. She saw a crowd around her daughter and ran to assist. An officer tackled the mother before she entered the lobby and handcuffed her. While she lay on the ground in handcuffs, an officer tased the mother. Id. at 1270. The Eleventh Circuit noted that prior case law "clearly established that administering multiple taser shocks can amount to excessive force." Id. at 1275. The court further noted that "even if no preexisting case fits the facts of this case, [the officers'] actions fall within the narrow 'obvious clarity' exception to establish a violation of clearly established rights." Id. at 1276. In other words, it was "one of those cases that lies at the very core of what the Fourth Amendment prohibits." Id.

Similarly, in Fils, the plaintiff was a partygoer at a nightclub where he was also assisting the promoter of the nightclub. 647 F.3d at 1290. The plaintiff escorted a disgruntled and agitated partygoer out of the club to two police officers. Allegedly,

---

[6] While the Eleventh Circuit issued this decision in March 2024, it held that no reasonable officer would find the conduct to be lawful in February 2014. 97 F.4th at 1241–42.

chaos ensued, and the agitated partygoer was arrested and thrown to the ground. A friend of the partygoer was upset and advanced at the officers. She was tased and four officers arrived as backup. The plaintiff was speaking with the promoter with his back facing the officers before departing. He allegedly told the promoter, "They're overreacting, these motherfuckers are overreacting." An officer then allegedly said "what you said, motherfucker" and drew his taser. The plaintiff turned around, saw the taser, took a step away from the officer and raised his hands. Then the officer deployed his taser at the plaintiff's chest without a verbal warning. The plaintiff stood frozen and a second officer tased the plaintiff again. The plaintiff fell and the first officer kneed the plaintiff in the back and grinded his contact taser in the back of the plaintiff's neck while the plaintiff was on the ground. Id. at 1276–77. The court held that prior case law "clearly established" that the officers violated the plaintiff's Fourth Amendment rights, but even if no case existed, the officers' conduct would fall under the narrow "obvious clarity" exception. Id. at 1291–92.

In Acosta, officers responded to a 911 call by the plaintiff's girlfriend that indicated he may pose a danger to her. 97 F.4th at 1236–37. After the officers arrived, the plaintiff fled from the home, and officers chased the plaintiff through the neighborhood. When two officers reached the plaintiff, they could not immediately handcuff him because he was resisting arrest. The officers eventually brought the plaintiff to the ground through the use of a chokehold and a taser. Four other officers then caught up and tased and kicked the plaintiff. Neighbors who witnessed the arrest testified that the plaintiff had stopped resisting once he was on the ground. Id. at 1237.

20

The Eleventh Circuit held that its precedent clearly established that all uses of force employed after the plaintiff was brought to the ground were excessive. Id. at 1241–42.

Finally, Eleventh Circuit precedent clearly establishes that it was unlawful to slam Plaintiff against the hood of the vehicle after arriving at the police station. See Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). In Lee, the plaintiff was pulled over for honking her horn at a vehicle in front of her that did not move despite the traffic light being green. In the course of this stop, the officer grabbed the plaintiff's wrist without warning and pulled the plaintiff out of her vehicle and arrested her. After the handcuffs were on and the plaintiff was secured, the officer led the plaintiff to the trunk of her car and slammed her head against the trunk. Id. at 1190–92. The court held that it was "abundantly clear" that the officer used force that was "plainly excessive, wholly unnecessary, and . . . grossly disproportionate[.]" Id. at 1198. The court then held that the "grossly disproportionate force used in this case was clearly established as a constitutional violation because no reasonable officer could have believed that [the officer's] actions were legal." Id. at 1199.

Considering this authority, the Court finds Plaintiff's right to be free from the force he alleges was used against him was clearly established at the time of this encounter with the Defendant Officers. Under Plaintiff's version of the facts, which, again the Court must accept as true, he attempted to comply with the demand to exit the vehicle. He was given no opportunity to comply with the Arresting Officers' order that he exit his vehicle. He presented no resistance, and he was brought to the ground

21

and punched while officers knelt on top him. See Hadley, 526 F.3d at 1330. He held his palms open by his face in a posture of surrender to indicate a lack of resistance, yet he was tased three times. Officers then piled on him, continued to punch him and then tased him again in the back. See Helm, 989 F.3d at 1276; Fils, 647 F.3d at 1290; see also Acosta, 97 F.4th at 1239–40. Later, after he had been handcuffed and was brought to the police station, Officers removed him from the vehicle and gratuitously slammed him against a vehicle while they cranked his arms back behind his head. See Lee, 284 F.3d at 1198.

Accordingly, at this stage of the proceedings, accepting these allegations as true and construing them in the light most favorable to the Plaintiff, the Court finds that no reasonable officer would find the alleged force used at the various stages of the arrest to be lawful. The Court finds, therefore, that at the motion to dismiss stage of this litigation, Defendants are not entitled to qualified immunity on Plaintiff's excessive force claim.

If, however, Defendants contend that the Supreme Court's decision in Zorn v. Linton changes this Court's case-specific analysis, Defendants may seek reconsideration of this ruling on that basis or raise the issue on summary judgment.

### C. Count III: Supervisory Liability

Defendants next argue that Plaintiff's Complaint fails to allege a proper basis for supervisory liability. "Supervisory officials cannot be held liable under § 1983 for unconstitutional acts by their subordinates based on respondeat-superior or vicarious-liability principles." Piazza v. Jefferson Cnty., Ala., 923 F.3d 947, 957 (11th Cir. 2019).

"[S]upervisory liability under § 1983 occurs when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). A plaintiff may establish a causal connection on a theory of deliberate indifference, widespread abuse, or failure to stop. Id.

Plaintiff's Complaint appears to allege that Defendants Taylor and Eby (the "Supervisory Defendants") caused the constitutional injury that befell Plaintiff.[7] (Dkt. 1 at ¶¶ 5, 125–36) In particular, Plaintiff alleges that the Supervisory Defendants took no action to discipline the Arresting Officers, thereby creating an environment that condoned the Arresting Officers' conduct. (Id. at ¶¶ 132–33) Plaintiff also alleges that the Supervisory Defendants "engaged in acts and omissions that were the product of reckless or callous indifference to Plaintiff's constitutional rights to wit: the Supervisory Defendants approved, endorsed, and/or condoned the arrest . . . ." (Id. at ¶ 134) Finally, Plaintiff alleges that, by their failure to intervene in the false arrest of Plaintiff and use of excess force against Plaintiff, the Supervisory Defendants caused Plaintiff's constitutional deprivation. (Id. at ¶ 134)

---

[7] In paragraph 4 of the Complaint, Plaintiff alleges that Defendants Sergeant Mark Eby and Police Chief Sam Taylor were direct supervisors of the Arresting Officers and defines Defendants Eby and Taylor as the "Supervisory Defendants." (Dkt. 1 at ¶ 4) Later, in Count III, Plaintiff defines the "Supervisory Defendants" as "Defendant Mutz and Defendant Chief Taylor." (Id. at ¶ 126) In his responses to the motions to dismiss, Plaintiff acknowledges this reference to "Defendant Mutz" was a misnomer. (Dkt. 22 at 12; Dkt. 23 at 12)

Defendants challenge Plaintiff's supervisory liability claim on three grounds: (1) Plaintiff has not met his burden of establishing widespread abuse; (2) allegations of failures after Plaintiff's arrest do not support a claim; and (3) Plaintiff's attempt to bring a "failure to intervene" claim fails. In his response, Plaintiff does not directly challenge these assertions. Instead, Plaintiff merely alleges he has adequately "pled that the Supervisory Defendants caused, through their acts or failures to act, Plaintiff's constitutional violation." (Dkt. 22 at 12; Dkt. 23 at 12)

Defendants first argue that Plaintiff has not met his burden of establishing widespread abuse because "deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). It is not apparent to the Court that Plaintiff was attempting to plead a "widespread abuse" theory of supervisory liability, and Plaintiff makes no attempt to address this argument in his response. As such, because it does not appear that Plaintiff is attempting to rely on a theory of widespread abuse to support his claim for supervisory liability, Defendants' motions to dismiss Count III on this basis are denied as moot.

Defendant next argues that Plaintiff's allegations of any failure to discipline the Arresting Officers after Plaintiff's arrest cannot support a claim for supervisory liability. Defendants are correct. Simply put, Plaintiff cannot assert that actions taking place after his arrest caused the alleged constitutional violations that took place during his arrest. Thus, to the extent Plaintiff's claim for supervisory liability rests on post-

24

violation conduct, Plaintiff's claim fails.

Finally, Defendants argue that any "failure to intervene" supervisory liability claim fails because a duty to intervene is limited to excessive force and only when the official is in a position to intervene. Thus Defendants, relying on their argument that Plaintiff has not adequately alleged a claim for excessive force, assert that any claim for failure to intervene necessarily fails.

As an initial matter, the Court notes that a "failure to intervene" in excessive force cases differs from a "failure to stop" claim under a theory of supervisory liability. See Keating v. City of Miami, 598 F.3d 753, 765 (11th Cir. 2010) ("The difference between a direct failure to intervene claim and a failure to stop claim under a theory of supervisory liability lies in the position and authority of the defendant with respect to the person who commits the constitutional violation."). A plaintiff can establish a causal connection under this theory if the plaintiff can show the offending officers' supervisor "(1) ha[d] the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fail[ed] to exercise that authority to stop it." Id. at 765.

Here, Plaintiff has not alleged that Defendant Taylor was present at the scene of his arrest or otherwise had the ability to stop the Arresting Officers from either using excessive force against Plaintiff or falsely arresting Plaintiff. Accordingly, Count III is due to be dismissed with respect to Defendant Taylor. With respect to Defendant Eby, however, the Court finds that Plaintiff has adequately alleged a claim for supervisory

25

liability on a "failure to stop" theory. The Complaint alleges that Defendant Eby was present at the scene of Plaintiff's arrest. Plaintiff also claims that Defendant Eby was a supervisor of the other officers present, and that he allowed the violent attack on Plaintiff to occur as he stood by with a flashlight and yelled at bystanders to step away from the scene. (Dkt. 1 at ¶¶ 4, 32, 64) The Complaint further alleges that, while Plaintiff's family members were begging officers to stop hitting Plaintiff, Defendant Eby responded: "Well then, he needs to quit fighting." (Id. at ¶ 67) Finally, the Complaint alleges Defendant Eby was present while Plaintiff was placed in a police car and transported to the Polk County Jail. It alleges, in general terms, that Defendant Eby was present at the police station when Plaintiff claims he was further slammed against the hood of a police vehicle and his handcuffed arms were forcibly pulled up toward his head. Finally, the Complaint alleges that Defendant Eby was present and did not stop the other officers in his command from charging Plaintiff without probable cause. (Id. at ¶ 128)

Taken together and construed in the light most favorable to Plaintiff, these allegations are sufficient to show that (1) Defendant Eby had the ability to prevent or discontinue the use of excessive force against Plaintiff and the false arrest of Plaintiff, and (2) he failed to exercise that authority. Accordingly, Count III is dismissed as to Defendant Taylor. With respect to Defendant Eby, Count III survives only to the limited extent that Plaintiff may pursue a supervisory liability claim on a theory of "failure to stop" the use of excessive force against Plaintiff and false arrest of Plaintiff.

**D. Count IV: Municipal Liability (Monell Claim)**

Finally, Defendants argue that Count IV should be dismissed because Plaintiff fails to state a claim of municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). In particular, Defendants assert that Plaintiff does not allege any facts that could plausibly and causally link Defendants' alleged actions to an official custom or policy. Plaintiff responds that he properly pled both a "custom or practice" Monell claim and a "failure to train" Monell claim. (Dkt. 22 at 13–17) The Court addresses each argument in turn.

Municipalities cannot be held liable on a theory of *respondeat superior* for acts committed by their officers. Edom v. Chronister, No. 8:20-cv-1624-KKM-AEP, 2021 WL 4244845, at *8 (M.D. Fla. Sept. 17, 2021) (citing Monell, 436 U.S. at 691, 693–94). To hold a municipality liable under § 1983, a plaintiff must allege an unconstitutional action "executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." Monell, 436 U.S. at 690. The failure to train or supervise may also serve as the basis for municipal liability under § 1938. Doe v. Faerber, 446 F. Supp. 2d 1311, 1316 (M.D. Fla. 2006)

1. Policy or Custom

To succeed on a Monell claim, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the [municipality's] policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289

27

(11th Cir. 2004). To prove § 1983 liability against a municipality based on unofficial custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)). "In other words, a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Id. "A custom or practice, while not adopted as an official formal policy, may be so pervasive as to be the functional equivalent of a formal policy." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1330 n.6 (11th Cir. 2003) (citing Monell, 436 U.S. at 690–91; Church v. City of Huntsville, 30 F.3d 1332, 1343 (11th Cir. 1994)). "A single incident would not be so pervasive as to be a custom or practice." Id.

As set forth above, Plaintiff has adequately alleged that his constitutional rights were violated. Accordingly, the Court need only determine (1) whether Plaintiff has adequately alleged that the City of Lakeland had a custom or policy that constituted deliberate indifference to that constitutional right, and (2) that policy or custom caused the violation. Plaintiff alleges that the City had an "unwritten practice/policy that permitted police officers to initiate stops on Black drivers and then use excessive force to remove drivers from their vehicles." (Dkt. 1 at ¶ 160) He then alleges that "these policies were the moving force behind the constitutional violation(s) that befell Plaintiff, to wit: the Arresting Officers acted in conformity with these unwritten

28

policies when they conducted a traffic stop, arrested, charged, and subjected Plaintiff to excessive force . . . ." (Id. at ¶ 164)

Plaintiff then describes two factually similar circumstances where the Arresting Officers used excessive force. (Id. at ¶¶ 146–50) In particular, Plaintiff details an alleged incident involving the same officers wo are sued here. There Mr. Armani Evans, a black male, was approached by Defendant McCain and Defendant Jefferson while in a parked car. He told the officers he was going home, when they asked him to exit his car because they smelled cannabis. Despite Mr. Evans' posing no threat to the officers, they tased him and struck him several times with their fists and flashlights. (Id. at ¶¶ 146–47)

Plaintiff also details an alleged incident in which Mr. Timothy Davis, Jr., a black male, sat in his parked car waiting for his daughter at her bus stop when Defendant McCain and Defendant Jefferson approached his car. He was not operating his vehicle, but the officers alleged a seatbelt violation, pulled Mr. Davis out of his car by his hair and struck him multiple times until he lost consciousness. Mr. Davis suffered a broken jaw, broken right eye socket, and loss part of his vision in his right eye. (Id. at ¶ 150)[8]

---

[8] In their responses, Defendants note that Mr. Davis's Complaint, which Plaintiff cites in support of these allegations, (Dkt. 1 at ¶ 150), does not allege that Mr. Davis suffered a broken jaw, broken right eye socket, and lost part of his vision in his right eye. As a result, Defendants request that the Court take judicial notice of Mr. Davis's Complaint. First, the Court notes Plaintiff linked an article in his Complaint, (Id. at ¶ 149 n.4), that says Mr. Davis's injuries included a broken jaw and broken right eye socket resulting in partial, permanent vision loss in his right eye. See id. That article also states that the officers involved in the instant action were among the officers alleged to have been involved in the Davis incident, to wit, Sgt. Eby,

Plaintiff's Complaint also cites to various statistics regarding the Lakeland Police Department's ("LPD") use of force and racial disparities in its use of force. (Id. at ¶¶ 151–54) In particular, Plaintiff alleges that (1) among Florida police departments, LPD has statistically used more force per arrest than 95% of departments statewide; (2) LPD has a larger racial disparity in its use of deadly force than 80% of departments statewide; (3) in 2022, even though only 19.9% of the City's residents are black, they made up nearly 50% percent of those arrested by LPD; and (4) over 54.5% of all protective action incidents[9] carried out by LPD were carried out against black citizens. (Id.)

Plaintiff alleges that this pattern and practice with respect to the use of excessive force and its disproportionate use against Black citizens constitutes an unwritten policy or custom within the Lakeland Police Department of applying disproportionate force in officer interactions with Black citizens. He further alleges that this unwritten policy or custom put Plaintiff at the unreasonable risk of grievous bodily harm, injury, which occurred on the occasion of his encounter with the Defendant Officers.

Defendants argue that neither the statistics nor the purportedly similar incidents

---

Det. Cornn, Officer McCain, and Officer Jefferson. For purposes of this order, the Court ignores those assertions. Importantly, even if Plaintiff's complaint did not include a hyperlink to this article, the Court must accept as true all factual allegations in Plaintiff's Complaint in ruling on a motion to dismiss.

[9] This statistic comes from a 2023 report by the Lakeland Police Department's Office of Professional Standards, available at https://www.lakelandgov.net/media/17334/2022-ops-annual-report.pdf. "Protective action" appears to include the use of force as well as the threatened use of force. Types of protective action listed in the report include, but are not limited to, physical force, aerosol deterrent, k-9 deployment, and pointing of a weapon. Id.

suffice to state a plausible claim. Defendants are incorrect. While the statistics alone might be insufficient,[10] Plaintiff's allegations of similar incidents are sufficient to support this claim at this stage. See, e.g., Blessing v. Williams, No. 3:19-cv-731-J-32MCR, 2020 WL 1065116, at *5 (M.D. Fla. Mar. 5, 2020) (use of similar incidents sufficient to state Monell custom or practice claim at the motion to dismiss stage); Wilson v. Williams, No. 3:19-cv-822-J-34PDB, 2019 WL 6324265, at *4 (M.D. Fla. Nov. 26, 2019) (same). Again, the truth of these allegations is left to be determined at a later day.

### 2. Failure to Train

To sustain a failure to train theory under Monell, a plaintiff must plausibly allege that the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 379 (1989)). To allege a Monell claim based on this theory, a plaintiff must plead facts plausibly showing (1) the municipality inadequately trained or supervised its employees; (2) this failure to train or supervise constituted deliberate indifference to a constitutional right; and (3) the failure to train caused the employees to violate an individual's right. Id. "Because a governmental entity will rarely have an express policy of inadequately training or supervising its employees, a plaintiff may prove such

---

[10] See, e.g., Liss v. City of Jacksonville, No. 3:19-cv-185-J-32JBT, 2020 WL 4734932, at *3 (M.D. Fla. Aug. 14, 2020) (finding unwarranted "factual deductions" from plaintiff's statistics to be insufficient to withstand motion to dismiss Monell custom or practice claim).

31

a policy by showing that the entity's failure to train or supervise evidenced a deliberate indifference to the rights of its citizens." Sherman v. Baker, No. 23-cv-653, 2023 WL 4685332, at *2 (M.D. Fla. Jul. 21, 2023) (citing Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)). "A claim about an isolated incident generally cannot sustain a claim for failure to train . . . ." Id.  Instead, a plaintiff must allege facts to support "'a history of widespread prior abuse' such that the [government entity] was 'on notice of the need for improved training or supervision.'" Id. (quoting Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990)).

Defendants argue that Plaintiff failed to allege any facts that identify a deficiency in the City's training program or how such deficiency is related to Plaintiff's alleged false arrest and excessive force claims. The Court finds that Plaintiff sufficiently alleges that the City of Lakeland was on notice of its need to train and did not take any action. Plaintiff alleges that the circumstances of his incident and the exemplar incidences demonstrate that the City's training regarding the use of force is wholly inadequate, (Dkt. 1 at ¶¶ 166, 168), and that this inadequacy establishes the City's deliberate indifference to the constitutional rights of its Black citizens. (Id. at ¶ 169) Plaintiff also alleges the City's failure to train its officers, including the Arresting Officers, concerning the appropriate use of force caused the violation of Plaintiff's constitutional rights. (Id. at ¶ 170) While alone, these allegations would be conclusory, Plaintiff provides evidence of two similar incidents that would put the City on notice of the need for improved training or supervision. At this stage, this is sufficient. See Fleurant v. City of Port St. Lucie, No. 19-cv-14032, 2019 WL 12021806, at *9 (S.D.

32

Fla. Nov. 14, 2019) (plaintiff sufficiently alleged failure to adequately train by alleging three similar specific incidents), report and recommendation adopted, 2019 WL 12025012 (Dec. 10, 2019). Again, in litigation, it may be demonstrated that these facts are inaccurate and/or that the City does, in fact, have adequate training in place and employs appropriate discipline. Those facts are not before the Court on this motion.

Accordingly, Defendants' Motions are **DENIED** with respect to Count IV of Plaintiff's Complaint.

### IV.    CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1.  Defendants' Motions to Dismiss Plaintiff's Complaint, (Dkts. 17, 21), are **GRANTED IN PART and DENIED IN PART**:

    a.  The Motions are **GRANTED** to the extent that Counts I – III may proceed against Defendants solely in their individual capacity.

    b.  The Motions are **GRANTED** to the extent that Count III is **DISMISSED** as to Defendant Taylor. Count III survives against Defendant Eby.

    c.  The Motions are otherwise **DENIED**.

2.  If Defendants contend that the Supreme Court's decision in Zorn v. Linton, which was just rendered on March 23, 2026, mandates a different result in this case, Defendants may seek reconsideration

of this ruling on that basis or raise the issue on summary judgment. To the extent Defendants wish to seek reconsideration, Defendants shall file such a motion within **fourteen (14) days** from the date of this Order.

3. Defendants shall file an Answer to the Complaint within **twenty-one (21) days** of the date of this Order.

**DONE** and **ORDERED** in Tampa, Florida this 30th day of March 2026.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Party