# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ANTWAN GLOVER,**

      **Plaintiff,**

                           **Case No. 8:24-cv-2913-MSS-NHA**

**v.**

**CITY OF LAKELAND, CHIEF SAM L. TAYLOR, DETECTIVE DILLON J. CORNN, SERGEANT MARK EBY, OFFICER ANTON E. JEFFERSON, OFFICER JASON N. MCCAIN,**

      **Defendants.**

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, City of Lakeland, ("the City"); Chief Sam L. Taylor, in his individual capacity as an officer of the Lakeland Police Department; Detective Dillon J. Cornn, in his individual capacity as an officer of the Lakeland Police Department; Officer Anton E. Jefferson, in his individual capacity as an officer of the Lakeland Police Department; Sergeant Mark Eby, in his individual capacity as an officer of the Lakeland Police Department; and Officer Jason McCain, in his individual capacity as an officer of the Lakeland Police Department (collectively, "Defendants" or "the Officers") by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, hereby move this Court to grant summary judgment in Defendants' favor on all remaining claims brought by

Plaintiff, Antwan Glover.[1]  No genuine issue of material fact exists in the record, and Defendants are entitled to judgment in their favor as a matter of law on each count remaining in the Complaint.  In support of this Motion, Defendants provide the following Memorandum of Law.

## STATEMENT OF MATERIAL FACTS

1.      The relevant events took place around midnight on December 18, 2022 in around the 400 block of west 9th Street in Lakeland, Florida.  (Ex. F, 70:25).

2.      At that time, Lakeland Police Department ("LPD") Officers Cornn, Jefferson and McCain observed the driver of a black 4 door sedan BMW to not be wearing his seat belt.  (Doc. 1 ¶ 40.)

3.      As a result, the Officers pulled their vehicle in line with Plaintiff's driver's side window and advised they were initiating a traffic stop. (Doc. 1 ¶ 42; 44.)

4.      During the stop, Officer Cornn smelled the strong odor of burning cannabis and Officer McCain observed a cannabis cigar in plain sight in the center console near the cupholder.  (Doc. 1 ¶ 46)

---

[1] On March 31, 2026, the Court entered an Order (Dkt. 40) Granting in Part and Denying in Part Defendants' Motions to Dismiss Plaintiff's Complaint (Dkts. 17, 21). Those Motions were granted to the extent that Counts I, II, and III were permitted to proceed only against Defendants in their individual capacities and Dismissing Count III against Chief Taylor. (Dkt. 40, p. 33).

5. Thereafter, Officer McCain asked Plaintiff if he had marijuana in the car, which Plaintiff acknowledged he did. (Ex. D, 89:16-18)

6. During the stop, Officer McCain asked Plaintiff multiple times to turn off the engine and step out of the car, whereby Plaintiff refused. (Doc. 1 ¶ 56; Ex. D, 54: 1-6)

7. Despite being requested several times to exit the vehicle, Plaintiff refused to comply. (Ex. D, 55: 13-15)

8. Eventually, Plaintiff exited the vehicle and stood between the driver door and frame of the vehicle. (Ex. D, 55: 16-19).

9. At the same time, the Officers observed Plaintiff to be wearing a crossbody style bag close to his chest. (Doc. 1 ¶ 53; Ex. D, 56:12-16).

10. Thereafter, Officer Cornn observed Plaintiff "violently yelling at Officer McCain while raising his left hand directly towards McCain's face, while also pulling the bag away from McCain with his right hand." (Ex. D, 57- 58)

11. At this point, Officer Cornn testified that "his actions had kind of went from verbally resistant to passive resistant to now escalating to the full physical resistance, and physical violence toward myself." (Ex. D, 67-68). "And basically I told him that we need to take him to the ground." (Ex. D, 68: 4-7).

12. As Officer McCain attempted to remove the cross-body satchel from Plaintiff's shoulder, Plaintiff "attempted to grab the strap to the bag," at which time Officer McCain grabbed Plaintiff's wrist and commanded Plaintiff to stop resisting. Ex. F, 70:05-16.

13.    At that moment, Plaintiff and Officer McCain "started sliding down the side of the car" toward the ground. (Ex. F, 70:16-20). The ensuing confrontation which primarily unfolded on the ground near Plaintiff's vehicle are captured on video and form the principal basis for Plaintiff's excessive force claim. (*Id.*, 70:16-20).

14.    During the course of the arrest, the Arresting Officers utilized a combination of knee and hand strikes as well as a Conducted Energy Weapon ("Taser") and were ultimately able to gain control of Plaintiff and put him in custody. (Doc. 1 ¶ 71; 73).

15.    Sometime after Plaintiff was handcuffed, Plaintiff attempted to either sit up (Ex. F, 99:08-12) from the ground or, as Sgt. Eby perceived it, stand up (Ex. E, 49:02-18) and Sgt. Eby held him down with a hand on Plaintiff's shoulder.

16.    Plaintiff was subsequently transported to the Lakeland Police Department "sally port" before being booked into the Polk County Jail and, ultimately, charged with three counts of battery on a law enforcement officer and one count of resisting officers with violence. (Doc. 1 ¶ 87).

17.    As set forth below, no genuine issue of material fact exists in the record; while Plaintiff and Defendants , and Defendants are entitled to summary judgment in their favor as a matter of law on each count remaining in the Complaint.

## LEGAL STANDARD

Summary judgment is appropriate when there are no genuine dispute as to any material fact when the evidence is viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(a); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the claim. *Id*. The movant has the initial burden of showing, through citation to record evidence, the lack of material dispute of fact. After that burden is carried, the burden shifts to the nonmovant to establish, with evidence beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324; Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018).

Defendants have raised qualified immunity as an affirmative defense to the Complaint. (Doc. 12, ¶ 7). "Qualified immunity offers complete protection for individual public officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citations and internal quotation marks omitted). Thus, qualified immunity shields a government official from liability unless "the official's conduct 'was so far beyond the hazy border between excessive and acceptable force [that every objectively reasonable officer] had to know he was violating the Constitution even without caselaw on point.'" *Priester v. City of Riviera Beach,*

*Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quoting *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)). "In considering the circumstances, courts "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1334 (11th Cir. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

For a public official to avail himself of qualified immunity, he "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (citations and quotation marks omitted). A government official acts within the scope of his discretionary authority if "the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995). "The determination that an [official] was acting within his or her discretionary authority is a 'low hurdle' to clear." *Sims v. Forehand*, 112 F.Supp.2d 1260, 1267 (M.D. Ala. 2000). If the official satisfies this low hurdle, then the burden shifts to the plaintiff to show that the official violated clearly established constitutional law and that qualified immunity is not appropriate. *Sims*, 112 F.Supp.2d at 1267; *Vinyard*, 311 F.3d at 1346; *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

Here, Defendants move for summary judgment on each of Plaintiff's claims because (I) undisputed record evidence shows that the force used was not excessive in light of Plaintiff's active resistance; (II) Defendants had probable cause to arrest Plaintiff; (III) the lack of an underlying constitutional violation also defeats the claim of Supervisory Liability against Sgt. Eby, and he additionally was not in a position to stop the allegedly excessive force; and (IV) Plaintiff has failed to establish that the Lakeland Police Department was on notice of a pattern of constitutional violations of the sort alleged in this case. Defendants additionally move for summary judgment on Plaintiff's claimed damages because no record evidence shows that the injuries were caused by this arrest. Defendants address each of these points in turn, below.

**ARGUMENT**

## I. The Officers Are Entitled to Qualified Immunity on the Excessive Force Claim.

Plaintiff asserts that "the Arresting Officers used excessive force when they arrested and/or seized Plaintiff by (a) forcibly wrestled Plaintiff to the ground; (b) repeatedly punched him in his face and torso; (c) repeatedly forced his body into the ground using their body weight; (d) deployed their CEWs into Plaintiff's body; (e) took Plaintiff into custody; (f) transported Plaintiff to Polk County Jail; and (g) effectuated his processing and booking at Polk County Jail. (Doc. 1 ¶ 107).

To prove a Fourth Amendment violation based on excessive force, a plaintiff must prove "(1) that a seizure occurred, and (2) that the forced used to effect the

seizure was unreasonable." *Troupe v. Sarasota Cty.*, 419F3d 1160, 1166 (11th Cir. 2005). Courts engage in a reasonableness analysis when analyzing the use of force of a law enforcement officer. Crucially, this reasonableness inquiry "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Since the Supreme Court in *Graham* provided a list of circumstances Courts should consider when evaluating the reasonableness of an arrest, the Eleventh Circuit has distilled "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, into a six-factor analysis, including: (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted. *Edwards v. Grubbs*, 169 F.4th 1261, 1276 (11th Cir. 2026) As seen below, application of the *Graha*m factors to this case weighs strongly in the favor of the Defendants on each of the prongs.

The first factor relates to the severity of the crime. The initial reason for Plaintiff's stop and detention was that Plaintiff was not wearing his seatbelt and, when the Officers approached his stopped vehicle for that traffic infraction, they smelled burnt marijuana emanating from the vehicle. While Plaintiff disputes whether he physically struggled with the officers, he admits that he initially resisted their lawful command to exit the vehicle. *(see* Ex. F, 87:16-25; 88:1-4.)

Plaintiff further acknowledges reaching for the strap of the satchel he was wearing, despite knowing that the officers were concerned that it might contain a weapon. Thus, although the parties dispute the degree of Plaintiff's resistance, at the very least, from the perspective of a reasonable officer on the scene, Plaintiff's actions supported an arrest for resisting a lawful detention. Thus, when viewing the facts in the light most favorable to Plaintiff, this factor likely weighs lightly in favor of Plaintiff.

Once Plaintiff started resisting, he tipped the second factor—whether he posed an immediate threat to the safety of the Officers or others—toward the Officers, since they had no way of knowing whether the suspect who physically resisting their lawful detention was also readily armed were unaware as to what could be inside the satchel. Additionally, the Officers were confronted with this struggle at night, in front of a residence Plaintiff had chosen to park in front of while Plaintiff's passengers and/or relatives converged and became increasingly displeased with and screamed at the Officers (Doc. 1. at 66, 68) and, based on the presence of marijuana in the car, may have been under the influence of narcotics. *Cf. Fils v. City of Aventura*, 647 F.3d 1272, 1288, 23 Fla. L. Weekly Fed. C 176 (11th Cir. 2011) (finding no excessive force used where officer threw plaintiff to the ground after plaintiff was verbally aggressive and expressed displeasure with officers, took a step toward them and "the presence of a small, potentially intoxicated crowd further escalated the perceived danger.")

The third factor—whether Plaintiff was actively resisting arrest—favors the Officers as well. This factor is perhaps the most hotly contested between the parties. Plaintiff denies resisting arrest at any point during the incident (*see*, *e.g.*, Ex. F, 110:06-09) despite, as discussed above, admitting to conduct which constitutes at least passive resistance. Additionally, the video of the incident conclusively refutes Plaintiff's denial that he resisted arrest. Though easy to miss when watching the video at full speed, the available cell phone video clearly shows Plaintiff resisting arrest by, at the very least, pulling his left arm away from Det. Cornn after the officer grasped Plaintiff's wrist to initiate handcuffing. Specifically, Det. Cornn is seen attempting to grab Plaintiff's left wrist for handcuffing (Incident video, slowed, 00:34) and Mr. Glover can be seen jerking that same arm from Det. Cornn's grasp and pulling it down toward his waistband area. (*Id*. at 00:36.). It is at that time that Det. Cornn administers two closed fist strikes to Plaintiff's head. Thus, although Plaintiff disputes the material fact of whether he was resisting arrest, "the available [ ] camera footage plainly contradicts Plaintiff's alleged version of events," and the Court should "accept[] the video depictions rather than Plaintiff's account, viewing the facts in the light depicted by the video." *Juste v. Presume*, No. 24-24756-CIV-GAYLES, 2026 U.S. Dist. LEXIS 6735, at *10 (S.D. Fla. Jan. 8, 2026); *citing Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313,1315 (11th Cir. 2010) and *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") This same proposition also defeats Plaintiff's allegations that impermissible force was used in the Sally Port. Video of that incident, beginning at the 1:54:13 mark, clearly shows that the officers did not lift Plaintiff's arms above his head or wring the handcuffs around his wrists, as he claims.

Because Plaintiff was actively resisting, the fourth and fifth factors relating to the need for and amount of force used, likewise favor Defendants. As an initial matter, Officer McCain is not accused of engaging in any force beyond holding Plaintiff's legs. "I don't think Jason McCain hit me to be honest." (Ex. F, 107:17-20). The Eleventh Circuit has held that punches to the face are reasonable and even *de minimus* in circumstances where an officer is trying to gain control of a noncompliant subject. *Woodruff v. Trussville*, 434 F. App'x 852, 855 (11th Cir. 2011) ("The kind of force alleged by Woodruff -- including Adams punching Woodruff in the face, forcefully removing him from his car, and slamming him on the ground -- even when construed in the light most favorable to Woodruff, constituted only de minimis force.")

Before resorting to fist strikes, the Officers first attempted to gain Plaintiff's compliance with taser deployments. In the video footage, Plaintiff is seen immobilized by the taser, beginning around the 00:15 mark of the video. Muscular immobilization is evident in that while the buzzing of the taser can be heard, Plaintiff is seen lying rigidly still, not talking, with his hands up alongside his head.

(Incident Video[2], 00:15-00:19). As soon as the taser sound ceases, Plaintiff lifts his head and begins speaking again. (*Id*. at 00:19). Plaintiff's use of force expert, Mr. Bercovici, concedes that he cannot tell from the video whether Plaintiff voluntarily had his hands raised, or was experiencing the effects of the taser. (Ex. B, 71:01-07). Although he posits that Plaintiff was "defenseless" during this time, no force was used against Plaintiff while he was under the effects of the taser. Once Plaintiff's body was no longer rigid from the taser, the Officers attempted to immediately move in and effect his arrest – just as Bercovici would prescribe. (Ex. B, 72:20-23). Used in this manner, taser use has been routinely found to be reasonable since they generally do not cause serious injury and are designed to prevent—or, in this case, conclude—the more dangerous scenario of a physical confrontation between officers and a subject. "This Court has held that 'the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force. This is because, where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) (citations omitted).

The final factor—the extent of the injury inflicted—also favors Defendants. Mr. Glover alleges that he suffered a number of injuries from the incident, including puncture marks from the taser prongs, scuffs over his back, arms, and

---

[2] Concurrent with this Motion, Defendants have filed an Unopposed Motion for Leave to File Video Exhibits, Doc. 52, and numbers for these exhibits are pending the Court's granting of that motion.

leg, and a chipped or dislodged tooth. (Ex. F, 157:1-12). As to the scuffs, Plaintiff alleges that he obtained those while "on the ground." (*Id.* at 157:19-22). The taser marks were on the left side of his upper back or midback area (*Id.* at 159:22-25). These injuries are relatively minor, as evidenced by the fact that Plaintiff did not treat with any medical provider for any of the above alleged injuries. (*Id.* at 159:04-17; 161:08-10; and 161:18-162:10). Additionally, although Plaintiff posits that he was told the allegedly chipped tooth needed to be extracted, he did not follow up with any dental provider to have that work done. (*Id.* at 171: 2-14).  And, as is discussed further below, Plaintiff's claim that he required surgery to his left shoulder because of this incident is not supported by competent evidence and should not be considered.

Because even in the light most favorable to Plaintiff (and the video evidence), no reasonable jury considering the totality of the circumstances could conclude that the Arresting Officers violated Mr. Glover's right to be free from excessive force, Defendants are entitled to judgment on this claim.

Should the Court reach a different conclusion, however, Defendants are nonetheless entitled to judgment on this claim because "at the time of the alleged conduct, the actions of the officers did not violate clearly established law. *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017). Numerous cases have found the force used or allegedly used to be constitutionally permissible when necessary to subdue a noncompliant suspect. Nor does the combination of these tactics transform the conduct into constitutionally "excessive" conduct.  Indeed, courts

have approved of the tasering of even handcuffed suspects when they were still resisting and pulling away from arresting officers. *Leach*, 2024 U.S. App. LEXIS 11637, at *17; *see also*, *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1300, 1306 (11th Cir. 2009) (finding that the use of a taser three times on a handcuffed and shackled arrestee was not excessive force under the Eighth Amendment where the arrestee refused verbal commands and flailed uncontrollably).

## II.    The Officers Are Entitled to Qualified Immunity on the False Arrest Claim because Probable Cause Existed.

In Count II, Plaintiff sued the Officers in their individual capacities claiming they violated his Fourth and Fourteenth Amendment rights by arresting him without a valid warrant, consent, or probable cause.  However, the Officers are entitled to summary judgment on Plaintiff's claim for false arrest because the facts material to the existence of probable cause to arrest the Plaintiff are not in dispute.

The Fourth Amendment protects citizens from arrests that are unreasonable. *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009). "A warrantless arrest without probable cause is per se unconstitutional, and it provides a basis for a false arrest claim under 42 U.S.C. § 1983." *Id*. at 1326-27. But if probable cause supports the arrest, the arrestee has no basis for a Section 1983 action. *Id*. "Probable cause exists when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

*Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (internal quotation marks omitted). In the Eleventh Circuit, "an officer is not required to be able to prove every element of a crime before making an arrest." *Davis v. City of Apopka*, 78 F.4th 1326, 1349 (11th Cir. 2023). Nor is an officer "required to resolve every inconsistency in the evidence before making an arrest." *Id.*

An officer may conduct an investigatory detention "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Reasonable suspicion is an objective question viewed from the standpoint of a reasonable officer at the scene"; the question "is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed." *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005). "A suspect's conduct might be ambiguous and susceptible of an innocent explanation, but an officer equipped with articulable suspicion is entitled to resolve that ambiguity in favor of an investigatory stop." *United States v. Graham*, 496 F. App'x 961, 962 (11th Cir. 2012).

"When a defendant raises the defense of qualified immunity, the standard is 'arguable' reasonable suspicion." *Henning v. Harrel*, No. 6:15-cv-1520-Orl-40KRS, 2017 U.S. Dist. LEXIS 214958, at *13-14 (M.D. Fla. Mar. 1, 2017) (citing *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332-33 (11th Cir. 2004); *Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir. 2000)). "The test for arguable reasonable

suspicion is whether an objectively reasonable officer with the same information and under the same circumstances could have believed that reasonable suspicion existed." *Id.* (citing *Crosby*, 394 F.3d at 1332). "Qualified immunity is still available to an officer who mistakenly concludes reasonable suspicion is present, so long as the officer had 'arguable' reasonable suspicion for the investigatory stop." *Id.* (quoting *S.S. ex rel. Montgomery v. Bolton*, 522 F. App'x 452, 455 (11th Cir. 2013)) (citation marks omitted).

Here, the arresting Officers had the right to not only detain, but also to arrest Plaintiff on the night of the incident. Specifically, the Officers observed what they believed to be a seatbelt infraction – i.e., they had reason to believe Plaintiff was not wearing his seatbelt which was the reason for their stop. Plaintiff does not dispute that his seatbelt was off when officers approached. (Ex. F, 212:16-18). And, in any event, upon approaching Plaintiff's vehicle, the Officers had probable cause to detain Plaintiff after smelling burnt marijuana and observing a cannabis cigar in Plaintiff's center console during the early seconds of the traffic stop. (Ex. C, 50:6-9). *See, Bryan v. Spillman*, 217 F. App'x 882, 885 (11th Cir. 2007) (citations omitted) (holding that smell of marijuana emanating from vehicle established reasonable suspicion for search); *State v. Fortin*, 383 So. 3d 820, 823 (Fla. 4th DCA 2024) ("Generally, the smell of marijuana alone, fresh or burnt, is sufficient to provide probable cause for an officer to search a vehicle.") Plaintiff does not dispute he had marijuana in his vehicle at the time of the traffic stop:

A.  He asked me if I had marijuana in the car.

Q.  And you told him that you did?

A.  I said, yes sir, I do.

*(*Ex. E, 87: 16-18).  These circumstances alone establish probable cause to further detain Plaintiff pending search of his vehicle.  "The existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010).

Plaintiff, however, asserts there was no probable cause to search his vehicle because he had a medical marijuana card.  "...I have a medical marijuana license is what I have."  (Ex. E, 70:08-09).  However, the issue of whether Plaintiff had a medical marijuana license at the time of the stop is irrelevant to the question of whether the officers had probable cause to detain Plaintiff. *Owens v. State*, 317 So. 3d 1218, 1220 (Fla. 2d DCA 2021) ("[W]e conclude that the recent legalization of hemp, and under certain circumstances marijuana, does not serve as a sea change undoing existing precedent, and we hold that [...] the smell of marijuana emanating from a vehicle continues to provide probable cause for a warrantless search of the vehicle."), *overruled in part* by *Williams v. State*, 421 So. 3d 809, 819 (Fla. 2d DCA 2025). Although *Owens*' holding that the partial legalization of cannabis did not affect Fourth Amendment analysis was ultimately overruled by *Williams*, that change did not come until 2025, three years after this incident. At the time the officers conducted their stop of Defendant and smelled the marijuana, *Owens* was controlling law. Thus, the smell of burning marijuana provided officers

with probable cause to detain Plaintiff. Once Plaintiff resisted the officers' lawful commands relating to detaining him, they had probable cause to arrest him for resisting a lawful detention. Here, the Officers had probable cause to arrest Plaintiff because the Officers smelled and observed cannabis in the vehicle, and because Plaintiff did not comply with Officer McCain's request to step out of the vehicle:



A. He asked me if I had marijuana in the car.
Q. And you told him that you did?
A. I said, yes sir, I do.
Q. And that's when he told you --
A. My exact words.
Q. And that's when he told you get out of the car?
A. That's when he told me get out the car.
Q. Okay. And did you get out of the car when he told you to?

Page 88

A. No, I did not.
Q. What did you do?
A. I asked him why am I getting out of the car.

(Ex. F, 87:16-25; 88:1-4.) ("[S]o long as probable cause existed to arrest [the plaintiff] for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges." *Rodriguez v. Rambosk*, No. 2:23-cv-1102-SPC-DNF, 2026 U.S. Dist. LEXIS 41653, at *12 (M.D. Fla. Mar. 2, 2026). Because the Officers smelled and observed cannabis in the vehicle, and because Plaintiff refused to comply with Officer McCain's request

to step out of the vehicle, a reasonable officer in his position could conclude that Plaintiffs actions created a significant chance that criminal activity was afoot. Therefore, the Officers had arguable probable cause to arrest Plaintiff for resisting the Officers' commands and as such, the Officers are entitled to qualified immunity.

### III. Sgt. Eby is entitled to Judgment on Plaintiff's claim of Supervisor Liability in Count III.

Plaintiff's claim for supervisor liability against Chief Taylor was previously dismissed by the Court because Plaintiff did not allege that Chief Taylor was at the scene or otherwise had the ability to stop the arresting officers from using excessive force or falsely arresting plaintiff. (*See* Order, Doc. 40, p. 25-26; 33). Thus, Count III survives only as a "failure to stop" claim against Sgt. Eby. *Id.* Plaintiff claims that Sgt. Eby, as the supervisor of the Arresting Officers, failed to stop his false arrest as well as the excessive force allegedly used against him in effecting that arrest. However, this claim fails because, as elucidated above, Defendants are entitled to judgment in their favor on each of those claims of constitutional violation and a supervising officer cannot be liable under a failure to stop theory where no underlying constitutional violation has been shown. *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed.") *citing Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009) (There can be no obligation to intervene in the absence of an underlying constitutional violation.)

Even if the Court were to find that either of the underlying constitutional claims survive, the claim for supervisory liability still fails because Sgt. Eby did not have an opportunity to prevent the allegedly excessive force. To assign liability to Sgt. Eby for Failure to Stop, Plaintiff must establish that Sgt. Eby had an opportunity to intervene and stop or discontinue the unlawful force. In *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010), the Eleventh Circuit found that Plaintiff had pled sufficient facts to allege the supervising officers were responsible for failing to stop the acts of their subordinates in using less than lethal weapons to disperse a crowd of peaceful protestors. As the Court explained, "supervisors are liable under § 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" *Keating*, at 762. "A failure to stop claim under a theory of supervisory liability only requires that the supervisor (1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it." *Id.* at 765.

Unlike the facts in *Keating*, there is no record evidence here that Sgt. Eby directed any of the Arresting Officers to use any force, let alone excessive force, to effect the arrest of Plaintiff. And the record evidence fails to establish that Sgt. Eby knew of any constitutional violation or had the ability to stop or discontinue such violation.

Plaintiff's own use of force expert, Adam Bercovici, only reached the opinion that the only force that was excessive were Det. Cornn's hand strikes to Plaintiff's head after Plaintiff had been tasered. (Ex. B, 81:07-82:07). In forming that opinion, Mr. Bercovici acknowledged that he did not contemplate *any* resistance on the part of Plaintiff. (Ex. B, 73:06-08 and 74:08-23)).  Likewise, Mr. Glover has denied resisting arrest at any point during the incident. (*See*, *e.g.*, Ex. F, Dep. of Plaintiff, 110:06-09) As discussed above, video of the incident belies these positions. It is only after Plaintiff forcefully pulls his hand away from Detective Cornn that Det. Cornn uses hand strikes to gain Plaintiff's compliance. Although Mr. Bercovici testified that he considers Det. Cornn's hand strikes to be excessive force, he acknowledges that, as an LAPD instructor, he taught such strikes to subordinates for use "under appropriate circumstances." (Ex. B, 23:1-4). The circumstances that would warrant such strikes included situations where an officer is "fighting for control, you're fighting to get his hands free, he's possibly reaching for his waistband, reaching for a weapon, being noncompliant[...]" (*Id.*, at 23:05-15) (emphasis added). In fact, as an LAPD officer, Mr. Bercovici himself used hand strikes to gain compliance "when a suspect was actively resisting." (Ex. B, 15:13-22) Thus, despite Plaintiff's denial of resisting arrest and his expert's opinion regarding the force used, the objective video evidence conclusively demonstrates that Plaintiff was engaging in exactly the kind of conduct that Mr. Bercovici agrees may be permissibly countered with knee strikes and hand strikes.

The video further demonstrates how quickly Det. Cornn had to make the decision to use such force. Detective Cornn reaches to control Plaintiff's left hand at 00:19, delivers the initial hand strike between 00:21 and 00:22 and completes the second and final hand strike by 00:23. "Instances of force that occur within seconds do not place officers in a realistic position to intervene." *Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018). This is especially true considering Sgt. Eby was toward the rear of the vehicle at the time of these strikes, dealing with what he perceived to be a potential safety issue by trying to "put [himself] between" two individuals who had come up behind the officers. Ex. D, 47:11-48:13. No reasonable jury could find that Sgt. Eby, standing nearly a car-length away and focused on activities and individuals other than what was transpiring between Plaintiff and Detective Cornn, could have "anticipated and then stopped [Det. Cornn] from punching" Plaintiff twice in less than two seconds. *Cf. Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008) (Granting an officer qualified immunity on a failure to intervene claim where the officer's partner punched a compliant, handcuffed prisoner once in the stomach); *see also Ensley v. Soper*, 142 F.3d 1402, 1408 (11th Cir. 1998) (finding no failure to intervene because the defendant was not "in a position to intervene" while he was actively involved in the arrest of another person on scene and claimed he did not observe the use of excessive force against the original arrestee).

As to the false arrest claim, Sgt. Eby's uncontroverted testimony is that he did not personally observe the initial reason for the traffic stop, as he was in the

back seat of the patrol car when one of the Officers noticed that Plaintiff was not wearing a seatbelt. (Ex. E, 42:01-18, 65:25-66:01). Upon pulling up next to the vehicle, Sgt. Eby did smell marijuana, but quickly turns his focus to the backseat passengers of the vehicle, rather than directly on Plaintiff. (*Id.*, 42:22-44:13). Although Sgt. Eby sees Plaintiff begin to stand up from the driver's seat during the interaction with the other officers and believes, based on standard operating procedures, that Plaintiff is being detained relative to the presence of burned marijuana, he is unaware of exactly what transpired leading up to Plaintiff exiting the vehicle since he was "still watching the people in the car." (*Id.*, 46:24-47:11). Thus, reasonably relying on the representations of his fellow officers, Sgt. Eby at that point reasonably believed that Plaintiff was stopped for not wearing a seatbelt, that other officers smelled burning marijuana emanating from the vehicle Plaintiff was driving, and that Plaintiff began to struggle with the Officers who were attempting to detain him pursuant to those potential violations of law. Even if the Court were to find grounds for the false arrest claim to survive, no reasonable jury could find, under the totality of the above circumstances, that Sgt. Eby knew that the Arresting Officers were engaging in a constitutionally infirm arrest of Plaintiff. Therefore, he was under no obligation to stop the arrest.

## IV.   Plaintiff's *Monell* Claim Fails.

Similar to the supervisory liability claim, this claim also fails in the absence of an underlying constitutional violation. However, should the Court proceed to the substantive analysis, Plaintiff's claim that LPD had a custom or policy that was

the moving force behind the violation fails. In support of this claim, Plaintiff references two cases with purportedly similar factual circumstances in which LPD officers allegedly used excessive force. However, his appeal to these cases fails to establish that LPD was on notice of a pattern of constitutional violations of the sort alleged in this case. Primarily, these claims fail because neither case resulted in any sort of jury finding against LPD or its deputies or an admission of liability on the part of LPD. "[S]uits that were settled or voluntarily dismissed do not, without admissions of liability, put [the Law Enforcement Agency] on notice of any pattern of constitutional violations." *Buckler v. Israel*, 680 F. App'x 831, 836 (11th Cir. 2017). The Timothy Davis case was resolved out of court without any admission of liability; in fact, the Defendants in that case vigorously contested that they were liable and the settlement release reflected that they did not admit liability. *See* Ex. P. Similarly, there is no record that the case of Armani Evans resulted in a jury finding against LPD. Without support from those cases, the statistics cited by Plaintiff –which do not include any information about whether the force used was necessary or proportional, fail to meet Plaintiff's burden of forwarding evidence in the record that Defendants were on notice of a pattern or practice of these types of alleged constitutional violations. Although Plaintiff cites to a statistics that show a higher percentage of use of force incidents by LPD compared to surrounding departments, "the sheer number of use of force incidents, without more, does not establish a widespread custom of acquiescence to the use of excessive force." *Buckler v. Israel*, 680 F. App'x 831, 835 (11th Cir. 2017), *citing Brooks v. Scheib*,

{01434125-1 }                                        24

813 F.2d 1191, 1193 (11th Cir. 1987)("[T]he number of complaints bears no relation to their validity.").

The failure of Plaintiff's exemplar cases also helps defeat his Failure to Trian claim. Plaintiff's own expert could not find any deficiency in the training beyond the circuitous reasoning that, since this incident happened, the training must have been deficient. (Ex. B, 91:01-92:10).

## V.   Defendants Are Entitled to Summary Judgment on the Issue of Medical Causation.

Plaintiff seeks compensation for injuries he alleges he incurred during this arrest. In assessing whether Plaintiff is able to connect his claimed injuries to the force used to effect his arrest, "Daubert's general holding -- setting forth the trial judge's general "gatekeeping" obligation -- applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 1171 (1999).

Here, Plaintiff alleges he received injuries to include puncture marks from the taser prongs, scuffs over his back, arms, and leg, surgery to his left shoulder, and a chipped or dislodged tooth. (Ex. F, Dep. of Plaintiff, 157:1-12). As to the scuffs, Plaintiff alleges that he obtained those while "on the ground." (*Id.* at 157:19-22). The taser marks were on the left side of his upper back or midback area (*Id.* at 159:22-25). Plaintiff did not treat with any medical provider for any of the above alleged injuries. (*Id.* at 159:04-17; 161:08-10; and 161:18-162:10). Additionally,

although Plaintiff posits that he was told the allegedly chipped tooth needed to be extracted, he did not follow up with any dental provider to have that work done. (*Id.* at 171: 2-14). Tellingly, Plaintiff did not complain about any of these alleged injuries in the days following the arrest, nor did any medical provider or expert witness connect these injuries to the force used by the Arresting Officers.

Regarding his alleged left shoulder injury, Plaintiff did not complain of shoulder pain when he was evaluated by EMS on the date of his arrest, nor did he complain of shoulder pain at Lakeland Regional Health the following day. Rather, he affirmatively stated that he did not experience pain at the time of the arrest (Ex. E, LRH records, p. 14) and was currently complaining of neck pain; his "physical exam [was] consistent with muscle strain." *Id.* Cervical X-rays showed degenerative plate changes and loss of disc space height with vertebral body spurring, leading to an impression of "Cervical spondylosis with no acute cervical spine abnormality." (*Id.*, p. 26). The differential diagnosis consisted of neck injury, cervical strain, neck pain, or cervical fracture. (*Id.* at 13).

Ultimately, on August 28, 2023, Dr. Eric Wicks performed a left shoulder arthroscopy with anterior/ posterior superior labral debridement, left glenoid and left humeral head extensive chondroplasty with removal of loose bodies and a subacromial bursectomy with left rotator cuff debridement. The only medical opinion in the record about whether the condition necessitating this surgery was caused by Plaintiff's arrest on December 18, 2022, is from Defendants' expert orthopedic surgeon, Dr. Daniel Murphy. Dr. Murphy's uncontroverted opinion is

that, within a reasonable degree of medical probability, there was no injury to Plaintiff's shoulders relating to the arrest of December 18, 2022. (Ex. J, Dr. Murphy's report, p. 7). The surgical notes from August 28, 2023, corroborate that opinion, in that Dr. Wicks noted that Plaintiff's shoulder demonstrated advanced degeneration throughout Plaintiff's shoulder. Because Plaintiff will not be able to present any expert testimony as to causation of this shoulder injury, Defendants are entitled to judgment in their favor as to the issue of causation of this injury.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request this Court enter judgment in favor of Defendants as to each count and, if necessary, on the issue of causation of Plaintiff's alleged injuries.

## CERTIFICATE OF LOCAL RULE 3.01(g)
## GOOD FAITH CONFERRAL

Counsel for Defendants discussed the basis for their motion during an email conference with counsel and Plaintiff's counsel objects to the dismissal of Plaintiff's claims.

Respectfully submitted on May 27th, 2026.

Campbell Trohn Tamayo & Aranda, P.A.

By    /s/ *Jonathan B. Trohn*
**Jonathan B. Trohn**, *lead counsel*
Fla. Bar. No. 880558
j.trohn@cttalaw.com
**Jennifer H. Spath**

Fla. Bar No. 85964
j.spath@cttalaw.com
**Thomas L. Dudash**
Fla. Bar No. 1044473
t.dudash@cttalaw.com
1701 South Florida Avenue
Lakeland, Florida 33803
P.O. Box 2369
Lakeland, FL 33806-2369
(863) 686-0043 (phone)
(863) 616-1445 (facsimile)
Attorneys for Defendants

{01434125-1 }

28